IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JODI S.,[1]
     Plaintiff,

          v.                                 Civil No. 3:21-cv-00727 (DJN)

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,
     Defendant.

**REPORT AND RECOMMENDATION**

This is an action seeking review of the decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying Plaintiff's application for disabled widow's benefits under the Social Security Act ("Act"). At the time of her application date, Plaintiff was fifty-two years old and previously worked as a medical receptionist, hospital admissions director, and customer service representative. (R. at 52-54, 190-91, 240.) Plaintiff alleges she is unable to work due to knee pain, vaginal dysplasia, bipolar disorder, and depression. (R. at 46, 212.)

On May 20, 2021, an Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was not disabled. (R. at 19.) This matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment, rendering the matter ripe for review.[2]

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Report and Recommendation, and will further

Plaintiff now seeks review of the ALJ's decision. (Pl.'s Mem. Supp. Mot. Summ. J. 1-2, ECF No. 17 ("Pl.'s Mem.").) For the reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 15) and Motion for Remand (ECF No. 16) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 18) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disabled widow's benefits on October 16, 2019, alleging disability beginning February 3, 2016. (R. at 190-91.) The SSA denied Plaintiff's claim initially and upon reconsideration. (R. at 89, 105.) Plaintiff requested a hearing before an ALJ, and a hearing was held telephonically on April 7, 2021. (R. at 40-72, 122.) On May 20, 2021, the ALJ issued a written opinion, holding that Plaintiff was not disabled under the Act. (R. at 22-34.) On September 22, 2021, the SSA Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner. (R. at 1-3.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion.

---

restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

*Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. *Id.* §

404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. *Id.* § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must determine the claimant's residual functional capacity, accounting for the most the claimant can do despite her physical and mental limitations. *Id.* § 404.1545(a).

At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. *Id.* § 404.1520(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. 20 C.F.R. § 404.1520(e). However, if the claimant cannot perform her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. *Id.* § 404.1520(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 24-34.) *See* 20 C.F.R. § 404.1520(a)(4); *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation).

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity[3] since the alleged disability onset date, February 3, 2016. (R. at 24.) At step two, the ALJ

---

[3] Substantial gainful activity is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or

determined that Plaintiff had the following severe impairments: "bipolar disorder; anxiety disorder; and neurocognitive disorder (20 CFR 404.1520(c))." (R. at 24.) At step three, the ALJ determined that none of these impairments, individually or in combination, met or equaled a disability listing in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525, and 404.1526). (R. at 25.)

The ALJ then determined Plaintiff's residual functional capacity.[4] (R. at 27.) Based on the evidence in the record, the ALJ determined that Plaintiff had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), with the following exceptions:

> [Plaintiff] can frequently kneel, crouch, and climb ramps and stairs, and she can occasionally crawl and climb ladders, ropes, or scaffolds. Mentally, [Plaintiff] is able to perform simple, routine tasks, occasionally interacting with coworkers and supervisors, and performing "low stress" work, defined as work with occasional independent decision making and occasional workplace changes.

(R. at 27.) The ALJ explained that she determined Plaintiff's residual functional capacity after considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," in accordance with the regulations. (R. at 27.)

---

hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[4] Residual functional capacity is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the residual functional capacity, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

Based on her residual functional capacity findings, the ALJ concluded at step four that Plaintiff was not capable of performing past relevant work as a hospital admissions director, medical receptionist, or customer service representative. (R. at 33.) At step five, the ALJ found that there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. at 33.) In making her step five findings, the ALJ considered the testimony of a vocational expert, who opined that Plaintiff could perform the requirements of representative occupations such as hand packer, building cleaner, and landscape worker. (R. at 33-34.) Therefore, the ALJ determined that Plaintiff was not disabled under the Act. (R. at 34.)

## IV. FACTUAL BACKGROUND

### A.  Plaintiff's Mental Health Treatment History.

Shortly before the start of the relevant period, Plaintiff voluntarily entered psychiatric treatment for severe depression, suicidal ideation, panic, and anxiety following her separation from her husband the previous year. (R. at 297.) After her discharge, Plaintiff followed up with her treating psychiatrist, Shabana Firdous, M.D. ("Dr. Firdous") on February 8, 2016. (R. at 362.) At that time, Plaintiff presented on examination with a depressed, anxious, and irritable mood, but had appropriate affect, no suicidal ideation, possessed fair insight and judgment, indicated appropriate and goal-directed thought content, and was fully oriented to person, place, time, and situation. (R. at 362.) She indicated having trouble sleeping but had an appropriate appetite, no gross cognitive defects, and fair recent and past memory. (R. at 362.) Ten days later, Plaintiff reported "feeling somewhat better" but still had "significant episodes of irritability." (R. at 364.) Her mental status findings remained the same, although she reported that her sleep was "normal." (R. at 364.)  On February 29, 2016, Plaintiff reported "feeling okay" and that she "did well in the cruise." (R. at 366.) She told her doctor that her mood and sleep were "ok" but she continued to

"have some episodes of agitation." (R. at 366.) Her mental status findings remained the same, with the exception that she no longer appeared depressed or irritable. (R. at 366.)

On April 7, 2016, Plaintiff returned to Dr. Firdous when she reported having a panic attack and an ongoing irritable mood. (R. at 368.) Although her sleep was "good," and all other examination findings remained the same, she presented as anxious and irritable. (R. at 368.) Dr. Firdous increased her medication and encouraged her to "identify her triggers." (R. at 369.) Plaintiff "discussed coping skills to deal with mood issues" and reported "trying to plan a garden to keep her mind occupied." (R. at 369.) On April 28, 2016, Plaintiff again reported mood irritability and felt "she was manic last week and . . . empty this week. She was very talkative last week and was very busy. She has not been eating and lost weight. Her sleep is good." (R. at 370.) Her examination findings and prescribed medications remained unchanged. (R. at 370-71.) She reported feeling "depressed again" on May 16, 2016, but noted that she was seeing her therapist again and her appetite had been "good." (R. at 372.) Plaintiff had been looking for a job, but her motivation was low. (R. at 372.) Although her mental examination findings remained unchanged, Dr. Firdous added Zoloft to Plaintiff's medication regimen, but later discontinued it due to undesirable side effects. (R. at 372-73, 376-77.)

Plaintiff continued to treat with Dr. Firdous at the beginning of the month in June, July, and August 2016, returning at the end of August 2016 for a change in her medications due to unwanted weight gain and excessive sleep. (R. at 374-81.) She reported "feeling ok" in September 2016 and did not want to make changes to her medication at that time. (R. at 382.) Although her anxiety had "been moderately high," she was going on vacation and sleeping well. (R. at 382.) At the end of September, Plaintiff reported having "shakes" and wanted to change her medications,

but discussed going on vacation to Ocean City. (R. at 384-85.) On October 11, 2016, Plaintiff reported "feeling much better" although her motivation was still low. (R. at 386.)

On October 25, 2016, Plaintiff presented with a euthymic mood, and reported feeling "more stable" since restarting one of her medications. (R. at 388.) She reported "sleeping well and [that] her appetite is 'too good.'" (R. at 388.) She reported weight gain, but otherwise had normal mental examination findings. (R. at 388.) These findings remained unchanged at her follow-up appointment on November 15, 2016, when she reported normal mood and sleep, as well as better insight and confidence. (R. at 390.) A month later, Plaintiff "talked about the improvement she has had in a year" such as "managing [her] weight by eating healthy." (R. at 392.) Although she presented as "anxious" her psychological examination findings were otherwise normal, and she "discussed her future goals." (R. at 392-93.)

Plaintiff continued to treat with Dr. Firdous in January 2017, when she reported "feeling significantly better," having normal sleep, and was excited about going on a cruise. (R. at 394, 396.) Plaintiff's examination findings remained the same through the end of February, except she appeared in a euthymic mood. (R. at 394, 396, 398.) She presented at subsequent appointments as depressed, owing to the recent deaths of her husband, father-in-law, and a friend. (R. at 400-05.) On June 12, 2017, Plaintiff presented as euthymic but stressed because she was scheduled for vaginal ablation surgery the following day. (R. at 406.) Nonetheless, her mood had "drastically improved" due to an increase in her medication dosage. (R. at 406.) Her examination findings were normal and remained unchanged through October 2017. (R. at 406-412.)

During this time, Plaintiff also attended therapy at Chrysalis Counseling Center. Notes from March 2016 describe Plaintiff making jewelry, gardening, going to the gym twice a week, and staying out late to watch live music. (R. at 456.) In April 2016, she continued to enjoy live

music, went to Ocean City with friends, and was working out twice a week. (R. at 455-56.) Later that month, she told her therapist that she was applying to volunteer at a free clinic and got a job offer from a neighbor. (R. at 454.) Plaintiff was reportedly "sleeping well, exercising a lot" despite having ongoing medical concerns and feeling "empty [and] sad." (R. at 453.) In May 2016, Plaintiff reported making money from selling jewelry, "getting some household chores done," exercising, and wanting a new tattoo. (R. at 450-51.) In July 2016, Plaintiff went to Pittsburgh for the weekend to attend a concert and go to an amusement park, made plans to see friends, and "started putting out resumes for part-time job[s]." (R. at 444-45.) She attended a job interview in August, planned to go to the beach with friends in September, exercised, and shopped for clothes. (R. at 441-43) In September, she attended a music festival. (R. at 439.) In October 2016, she reported being busy decorating her house for Halloween and eating healthily after gaining weight following a change in medication. (R. at 438.) On November 10, 2016, she reported having had a "good trip to Texas" but turned down an offer to go away for a week with a band on tour. (R. at 437.)

In January 2017, Plaintiff went out for New Year's Eve and visited a friend. (R. at 433.) In February 2017, Plaintiff went on a cruise to Mexico and a trip to Charleston. (R. at 431.) Following her husband's death in March 2017, Plaintiff inherited "a lot of money" but felt overwhelmed in managing her deceased husband's estate. (R. at 402-03.) In May 2017, Plaintiff went to Ocean City, bought a new truck, got a new tattoo, and attended a wine festival with friends. (R. at 425, 427.) In July 2017, Plaintiff attended a concert with friends, and the following month bought a new house and continued to socialize. (R. at 419-21.) She told her therapist that she had been reading a self-help book and that frequent therapy appointments helped her deal with stress. (R. at 420.) In September 2017, Plaintiff moved into a home across the street from a cultural center

that had "all kinds of activities [and] chances for volunteering." (R. at 417.) On October 19, 2017, Plaintiff reported that her mood was "good/stable" and her anxiety "well-managed, despite high stressors." (R. at 414.) On examination, she had normal orientation, appearance, behavior, gait, mood, affect, speech, thought content and process, insight and judgment, and intact memory. (R. at 414.)

In January 2018, Plaintiff began to attend therapy sessions at Thriveworks Counseling. (R. at 557.) Plaintiff's mental status examinations showed her to be in a depressed and irritable mood, but with intact memory, good attention and concentration, linear thought process, and fair insight and judgment. (R. at 557.) She continued to have unremarkable or otherwise appropriate mental status examinations through October 2018. (R. at 562, 568, 575, 588, 590, 592, 597, 599, 601, 608, 623, 626, 628.) During that time, she went on trips for vacation and to see friends, exercised at the gym, managed her medication regimen, attended a rodeo, tended to her yard and garden, bought a sports car, and prepared for more traveling. (R. at 566, 575, 586-88, 590, 597, 599, 606, 613, 619, 628, 630.) In November and December 2018, she reported feeling increased depression as a result of missing several days of medication but spent the holidays with family and continued to travel. (R. at 634, 636, 638.)

Plaintiff's mental status examination findings remained largely unremarkable in 2019. (R. at 640, 642, 647, 649, 651, 653, 659, 663, 665, 667, 672, 676, 688, 706, 708, 716, 718, 726, 728, 730, 736.) She continued to go on vacations, attend live concerts, traveled to see friends and family, and planned to sell her house. (R. at 649, 659, 688, 706, 716, 730, 736.) She also continued to treat her symptoms with medication, researched alternative medication options, and kept a mood chart to monitor her symptoms. (R. at 676.) In November 2019, Plaintiff began treating with William Fox, M.D. ("Dr. Fox"), who noted Plaintiff's increased depression and anxiety "over the past

couple months," including morning panic attacks and decreased mood and appetite. (R. at 766.) He noted she had normal attention, memory, appearance, thought content, orientation, and speech, as well as fair judgment, insight, and good engagement. (R. at 770.) In December 2019, Dr. Fox noted Plaintiff's improved mood and anxiety since having surgery four weeks prior, noting she had "only two small panic attacks since last appointment." (R. at 764.) Plaintiff's sleep was better, and Dr. Fox found she had fair memory, attention, concentration, and insight. (R. at 764.) Plaintiff was reportedly tolerating increased dosage of her medication. (R. at 764.)

Plaintiff's mental status findings continued to be the same in January, February, and March 2020, despite some increased depression and anxiety. (R. at 1464, 1466, 1470, 1472, 1474.) However, she made an effort "to focus on the positives and [work] on remaining healthy." (R. at 1464.) She continued to travel and spend time with friends, attend a concert, exercise, and do yard work. (R. at 744, 746, 753, 1464, 1470, 1480, 1484, 1490.) In June 2020, she met with Dr. Fox and reported improvement in her symptoms despite some life stressors. (R. at 1638.) Mental status examinations remained unremarkable through November 2020, although Plaintiff reported stress related to her surgery, selling her house, COVID-19, finances, and the death of a friend. (R. at 1642, 1644, 1646, 1648, 1650.)

In 2021, Plaintiff continued to present as oriented, alert, and in a euthymic mood with appropriate affect. (R. at 1495, 1497, 1499.) She injured her knee in March 2021 and had to have surgery, but was otherwise able to "manage her emotional fluctuations more effectively" through therapy and medication management. (R. at 1502.)

**B. Plaintiff's Subjective Complaints.**

Plaintiff completed an adult function report as part of her application for benefits, in which she described how her mental impairments impacted her ability to perform daily activities. (R. at

249-57.) Plaintiff explained that her anxiety affects her ability to remember and follow directions, and that she was unable to "gain interest in hobbies." (R. at 249.) She explained that she wakes up, takes care of the house, goes to the gym, and runs errands. (R. at 249.) She cared for her pets by feeding, walking, grooming, and playing with them. (R. at 250.) She also explained that her close friends help her when she has surgery or is sick. (R. at 250.) Plaintiff endorsed excessive sleep due to medications and during depressive periods, and that she was unable to work, enjoy hobbies, or "easily be around groups of people" due to her mental impairments. (R. at 250.) However, she had no reported limitations in her ability to dress, bathe, or otherwise care for herself, although she endorsed not eating well "or at all when depressed." (R. at 250.) She attested to needing to write herself reminders to take care of her personal needs, and could cook mostly frozen, pre-made, or easy "non-cook" food. (R. at 252.) She could do her laundry, clean the house, and garden. (R. at 252.) Additionally, she goes outside five to six times a day, can drive and ride in a car, and shops for clothing and personal items about twice a month for about one hour. (R. at 253.) She reported being able to handle her own finances independently. (R. at 253.)

Plaintiff then proceeded to discuss her hobbies and interests, noting that she watches television, socializes with friends, makes jewelry, attends craft festivals, and music. (R. at 254.) She also watches television, travels twice a year, enjoys music, plays games, talks on the phone, but does not take part in social groups. (R. at 254.) She goes to therapy, doctors' appointments, and stores on a regular basis, talks on the phone weekly, and tries to see people weekly. (R. at 254.)

Plaintiff explained that she becomes easily distracted, gets anxious when given instructions, but can easily follow them and re-confirm what steps to take if given them. (R. at 255.) She estimated that she can pay attention for about fifteen to twenty minutes, and can finish

what she starts, depending on her mood. (R. at 255.) She has never had a problem with authority figures but does not handle stress well. (R. at 256.) Plaintiff shakes, has overwhelming panic attacks (lasting up to 10 minutes), and does not deal well with changes in routine. (R. at 256.) Plaintiff added that her husband's unexpected death in 2017 "accelerated symptoms of [her] disease, and [she] work[s] to maintain consistent medical care to manage day to day." (R. at 257.)

At her administrative hearing in April 2021, Plaintiff testified that her anxiety, difficulty concentrating, lack of motivation, and difficulty "deciphering complex situations" prevented her from working. (R. at 54.) Plaintiff told the ALJ that she has small panic attacks she can "get through" on a regular basis but described experiencing major panic attacks since her knee injury. (R. at 54-55.) She explained that the major panic attacks last up to half an hour, after which she needs about an hour to get back to baseline. (R. at 55.) Her depression cycles last about a week, during which she is unable to "get anything done[.]" (R. at 56.) Further, she testified that she worries "about absolutely everything" during her "manic phases," which impacts her appetite and "affects everything." (R. at 56-57.) Nonetheless, Plaintiff testified that her medications and therapy had been effective, and she did not experience any side effects. (R. at 57.)

On a normal day, Plaintiff follows a routine by caring for her pets, cleaning the house, and "do[ing] what [she] need[s] to do." (R. at 58.) When asked about her anxiety or stress in public, Plaintiff testified that she does not go out very often, and when she does, she goes with people because she has panic attacks when alone. (R. at 58.) She added that she gets along with people "very well." (R. at 58.) However, Plaintiff testified that her knee injury left her feeling "extremely depressed" and with "major anxiety attacks" and crying spells that leave her feeling helpless. (R. at 58-59.)

## V. ANALYSIS

In challenging the ALJ's decision, Plaintiff argues two errors warrant the direct calculation of benefits, or, in the alternative, remand. (Pl.'s Mem. at 1-2.) First, Plaintiff asserts that the ALJ's residual functional capacity is not supported by substantial evidence because the ALJ erred when evaluating the medical opinion evidence. (Pl.'s Mem. at 1-2, 10-13.) Second, Plaintiff argues the ALJ erred by finding Plaintiff's vaginal dysplasia a non-severe medical impairment. (Pl.'s Mem. at 2, 13-15.) Defendant responds that the decision should be affirmed because substantial evidence supports the ALJ's: (1) evaluation of the medical opinion evidence; and (2) step two findings. (Def.'s Mem. at 19-31.) For the reasons that follow, this Court finds that the ALJ did not err, and substantial evidence supports the ALJ's decision to find Plaintiff not disabled under the Act.

### A. The ALJ Did Not Err When Evaluating the Medical Opinion Evidence.

Plaintiff first argues that substantial evidence does not support the ALJ's assessment of the medical opinions completed by Nicole Sampson, Ph.D. ("Dr. Sampson"), David Leen, Ph.D. ("Dr. Leen"), and Dr. Fox. (Pl.'s Mem. at 9-12.) As a result, Plaintiff contends that the ALJ did not "include[] all the limitations [Plaintiff] testified to and Drs. Fox, Leen, and Sampson prescribed. Therefore, the Commissioner's decision should be reversed." (Pl.'s Mem. at 10.)[5] Defendant

---

[5] As part of this assignment of error, Plaintiff makes passing references to Barbara Bauman's third-party adult function report and a letter submitted after the ALJ's decision from Cynthia Sherman, a licensed clinical social worker. (Pl.'s Mem. at 1-2, 4, 12-13.) In doing so, Plaintiff appears to argue that this evidence, "if accepted, would result in a finding that [Plaintiff] is disabled." (Pl.'s Mem. at 1-2.) Plaintiff proceeds to describe portions of Ms. Bauman's report and Ms. Sherman's letter but fails to articulate how the ALJ erred in assessing this evidence. (*See* Pl.'s Mem. at 4, 11, 12-13.) Consequently, the undersigned finds that Plaintiff's failure to develop any argument as to Ms. Bauman's report and Ms. Sherman's letter waives any claim involving them. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Hughes v. B/E Aerospace, Inc.*, No. 1:12CV717, 2014 U.S. Dist. LEXIS 29535, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (Schroeder, J.) ("A party should not expect a court to do the work that it

responds that the ALJ properly "evaluated the evidence, including the opinion evidence, as contemplated by the regulations, and substantial evidence supports her fact-finding." (Def.'s Mem. at 20.) She adds that Plaintiff's arguments "are nothing more than an improper request that this Court re-weigh the evidence . . . ." (Def.'s Mem. at 20.)

   1. *Legal Standard for Evaluating Medical Opinion Evidence.*

Historically, for claims filed before March 27, 2017, the ALJ gave a treating medical source's opinion controlling weight, if medically acceptable clinical and laboratory diagnostic techniques supported it and it comported with other substantial evidence in the record. 20 U.S.C. § 404.1527(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).; SSR 96-2p, 1996 SSR LEXIS 9. However, for claims filed on or after March 27, 2017, revised regulations define what constitutes a medical opinion and how the Agency evaluates medical opinions. 20 C.F.R. §§ 404.1513(a)(2), 404.1520c; *Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 384 n.8 (4th Cir. 2021). Here, Plaintiff filed for disability benefits after March 27, 2017, and, therefore, the revised regulations apply. (R. at 190-91.)

The revised regulations define a medical opinion as "a statement from a medical source about what [a claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in the ability to perform physical, mental, or other demands of work activity or adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2). According to the new regulations, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior

---

elected not to do."). Consequently, the Court will address only the ALJ's consideration of the medical opinion evidence as to Dr. Sampson, Dr. Leen, and Dr. Fox.

administrative medical finding(s), including those from [a claimant's] medical sources." *Id.* § 404.1520c(a).

Moreover, when the ALJ articulates the consideration of a medical source, it need not individually discuss the consideration of each medical opinion from a single medical source. *Id.* § 404.1520c(b)(1). Rather, when a medical source provides multiple medical opinions, the ALJ will articulate the persuasiveness of those medical opinions together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5), as appropriate. *Id.* § 404.1520c(b)(1). These factors include: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and, (5) other factors. *Id.* § 404.1520c(c). Among the aforementioned factors, supportability and consistency carry the greatest import. *Id.* § 404.1520c(b)(2). Importantly, when presented with multiple medical opinions from a medical source, the ALJ need not discuss each factor in determining the persuasiveness of a medical source, but only how the ALJ considered the supportability and consistency of a medical source's medical opinions, in relation to the other objective medical evidence. *Id.* § 404.1520c(b)(2).

2. *Dr. Sampson's Opinion.*

Dr. Sampson, a state agency psychologist, reviewed the record and completed a psychiatric review technique form on July 27, 2020. (R. at 79-82.) Dr. Sampson noted Plaintiff's history of anxiety and depression, including a multi-day admission to the psychiatric hospital for suicidal ideation. (R. at 81.) She also described a psychological consultative exam that resulted in diagnoses of bipolar, panic disorder, and bereavement and noted that, during the examination, Plaintiff was "distractible, occasionally unable to verbalize a complete thought without shifting topic[s]" and had a "[d]epressed/anxious mood with dysphoric affect." (R. at 81.)

16

Based on her review, Dr. Sampson opined that Plaintiff had moderate limitations in her ability to understand and remember detailed instructions, but added that she is "able to understand, remember, and comprehend simple, unskilled work instructions." (R. at 85.) She also found that Plaintiff had "sustained concentration and persistence limitations" and was moderately limited in her ability to carry out detailed instructions and to maintain attention and concentration for extended periods. (R. at 85.) However, Dr. Sampson did not find Plaintiff to be limited in carrying out short and simple instructions, performing activities within a schedule, maintaining regular attendance, being punctual, sustaining an ordinary routine without special supervision, working in coordination or in proximity to others, and making simple work-related decisions. (R. at 85.) Dr. Sampson then evaluated Plaintiff's individual adaption and social interaction limitations, finding that Plaintiff could "appropriately interact socially with others, but was moderately limited in her ability to "respond appropriately to changes in the work setting." (R. at 86.)

Additionally, Dr. Sampson noted Plaintiff's activities of daily living, which included being able to care for her pets, cook and complete meals a couple times per week, perform single tasks that include light housework and yard work, drive and go out alone, manage her finances, and attend parties, dinners, and concerts. (R. at 80, 81). Dr. Sampson then concluded that "[c]onsidering the overall evidence, [Plaintiff] is able to maintain the ability to perform simple, unskilled task[s]" in employment with "simple change[s] in a low stress work environment." (R. at 81-82.) Nonetheless, Dr. Sampson concluded that Plaintiff "might miss 1-2 days/month due to her depression and anxiety." (R. at 86.)

### 3. *Dr. Leen's Opinion.*

On February 28, 2020, Plaintiff underwent a psychiatric interview with Dr. Leen, a clinical psychologist. (R. at 551.) In his assessment, Dr. Leen summarized Plaintiff's medical,

employment, social, and familial history before proceeding to conduct a mental status examination. (R. at 551-52). On examination, Dr. Leen found Plaintiff to be "correctly oriented and in good contact with her surroundings[,]"as well as "cleanly groomed" but appearing with a dysphoric affect, depressed and anxious mood. (R. at 552.) Plaintiff's thought processes appeared "mildly circumstantial and distractible in that she [was] occasionally unable to verbalize a complete thought without shifting to another topic." (R. at 552.) Dr. Leen noted that Plaintiff was "adequately cooperative and motivated and adequately able to concentrate and persist throughout this examination." (R. at 552.) "She correctly repeated 6 digits forward and 4 digits backward[,]" and "correctly recalled 1 of 3 stimulus words following a delay of 5 minutes." (R. at 553.) She was able to recall the current United States president but was unable to provide abstract interpretations of two proverbs. (R. at 552-53.) Overall, Dr. Leen found that Plaintiff's "clinical behavior in these respects suggests less than average level functioning in the areas of recall, abstract thinking and perhaps concentration." (R. at 553.)

Dr. Leen proceeded to summarize Plaintiff's activities of daily living. (R. at 553.) He noted that "[s]he drove a motor vehicle more than 15 miles to this examination," lived alone, did her own household chores, gardened, watched television, listened to music, managed her own financial affairs, and interacted with friends on a weekly basis. (R. at 553.) His diagnostic impressions included bipolar disorder, panic disorder, and bereavement, and estimated her prognosis to be "guarded to fair." (R. at 553.) He noted that she was able to manage her own funds, but found that "[s]econdary to [Plaintiff]'s dysphoria, mild distractibility, daytime fatigue, depressive loss of interest and motivation, panic attacks, and cognitive deficits, she [was] currently unable to consistently perform work activities of any kind in a timely and appropriate manner with or without additional supervision." (R. at 553.) Dr. Leen added that Plaintiff was "unable to maintain reliable

attendance in a work place" and that she had a moderate to marked limitation in interacting appropriately with supervisors, coworkers, and the public in a vocational setting. (R. at 553.) He found her "unable to complete a normal work week without interruptions resulting from her psychiatric disorders" and "generally unable to deal with the usual stresses of competitive work on a consistent full-time basis." (R. at 553.)

       *4.  Dr. Fox's Opinion.*

       On November 11, 2020, Plaintiff's treating psychiatrist wrote a letter on behalf of Plaintiff indicating that he diagnosed her with bipolar II disorder, and that her symptoms consisted of "depressed mood, anxiety, low energy, poor concentration and focus, poor appetite with weight loss and panic attacks." (R. at 1614.) Subsequently, on December 2, 2020, Dr. Fox completed a checkbox mental capacity assessment in which he opined on Plaintiff's ability to perform work-related activities. (R. at 785-86.) In his assessment, Dr. Fox opined that Plaintiff was moderately limited in her ability to: (1) carry out very short and simple instructions; (2) perform activities within a schedule, maintain regular attendance and be punctual; (3) sustain ordinary routine without special supervision; (4) make simple work-related decisions; (5) ask simple questions or request assistance; (6) get along with coworkers or peers without distracting them; and (7) maintain socially appropriate behavior. (R. at 785-86.) Dr. Fox assessed Plaintiff with marked limitations in her ability to: (1) carry out detailed instructions; (2) complete a normal workday without interruptions from psychologically based symptoms; (3) perform at a consistent pace with a one hour lunch break and two fifteen minute rest periods; (4) interact appropriately with the general public; (5) respond appropriately to changes in the work setting; (6) be aware of normal hazards and take appropriate precautions; and (7) set realistic goals or make plans independently of others. (R. at 785-86.) Finally, Dr. Fox found that Plaintiff was extremely limited in her ability to: (1)

maintain attention and concentration for extended periods; (2) work in coordination with or in proximity to others without being distracted by them; (3) complete a normal work week without interruptions from psychologically based symptoms; (4) accept instructions and respond appropriately to criticism from supervisors; and (5) travel in unfamiliar places or use public transportation. (R. at 785-86.)

### 5. The ALJ's Analysis of the Opinions of Dr. Sampson, Dr. Leen, and Dr. Fox.

In her analysis, the ALJ summarized the opinions of Dr. Sampson, Dr. Leen, and Dr. Fox. (R. at 31-32). In accordance with the regulations, the ALJ addressed how the opinions were supported by and consistent with the evidence. First, the ALJ summarized Dr. Sampson's opinion and found that it was supported by the evidence as to Plaintiff's "diagnoses, ongoing treatment, and normal mental status examinations." (R. at 31.) However, the ALJ found Dr. Sampson's opinion to be unpersuasive because it was "inconsistent with [Plaintiff]'s admitted capability for a broad range of daily activities, including gardening and housework, as well as her relatively active calendar throughout the relevant period, with regular vacations and social interaction with friends." (R. at 31.)

Second, and similarly, the ALJ determined that Dr. Leen's opinion was "inconsistent with [Plaintiff]'s normal mental status examinations throughout the relevant period." (R. at 32.) The ALJ also noted that Dr. Leen's opinion was "unsupported by his examination of [Plaintiff], during which she was adequately cooperative and motivated and adequately able to concentrate and persist, despite less than average function in recall, abstract thinking, and concentration." (R. at 31-32.)

Third, the ALJ was unpersuaded by Dr. Fox's opinion, in part, because he "provided no support for his opinion" and it was "inconsistent with [Plaintiff]'s cooperative and friendly

demeanor during her consultative examinations, her reported capability for social functioning and admitted capability for a broad range of daily activities, and her normal mental status examinations throughout the relevant period." (R. at 32.)

In challenging the ALJ's treatment of these medical opinions, Plaintiff fails to explain with specificity what the ALJ failed to consider in her assessments. Instead, Plaintiff points out that certain treatment notes identified by the ALJ as evidence supporting the residual functional capacity also contained evidence contradicting it. (Pl.'s Mem. at 12, *comparing* R. at 26, 29 *with* R. at 366-387.) For instance, Plaintiff contends that the ALJ's citations to treatment notes indicating no gross cognitive deficits, intact and fair-to-good memory, and subjective reports of improvement also showed "episodes of agitation, depression, difficulty accepting her diagnosis, irritability, mania, periods when she was very talkative and busy, low motivation, fatigue, and shakes (tremors) interfering with her activities." (Pl.'s Mem. at 12, citing R. at 366-87.)

However, Plaintiff's argument misunderstands the standard by which this Court is to conduct its review. Here, the issue before the Court is whether the ALJ committed legal error when evaluating Plaintiff's claim. Thus, "even if the allegedly contradictory evidence Plaintiff highlights could support a different result, the court's role is not to second-guess the ALJ's findings." *Brown v. Colvin*, 2016 WL 4425139, at *6 (D.S.C. Aug. 22, 2016), aff'd 675 F. App'x 336 (4th Cir. 2017.) Indeed, "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). Further, "[i]n reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]."). *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Rather, "[t]he duty to resolve conflicts in the evidence

rests with the ALJ, not with a reviewing court." *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996). When conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ. *See Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Indeed, it is not within the province of this Court to identify substantial evidence supporting a finding contrary to the determinations of the Commissioner. *See e.g., Estep v. Richardson*, 459 F.2d 1015, 1016-17 (4th Cir. 1972) ("The [Commissioner's] decision, if supported by substantial evidence must be affirmed even though the reviewing court believes that substantial evidence also supports a contrary result.").

As discussed above, the regulations require that the ALJ explain how she considered the consistency and supportability of the medical opinions and why—based on the evidence—the ALJ reached the particular conclusion she did as to the persuasiveness of the opinions. *See* 20 C.F.R. § 404.1520c(a)–(b). The ALJ satisfied that standard here. In this case, the ALJ carefully considered the entire range of medical evidence. *See Craig v. Chater*, 76 F.3d at 594-95; SSR 16-3p, 2016 SSR LEXIS 4 at *6, 2016 WL 1119029, at *2 (Mar. 16, 2016); see also SSR 96-8p, 1996 SSR LEXIS 5 at *13, 1996 WL 374184, at *5 (July 2, 1996) (The residual functional capacity "assessment must be based on all of the relevant evidence in the case record."). The ALJ gave sound reasons, in accordance with the regulations, for her conclusion that the opinions of Dr. Sampson, Dr. Leen, and Dr. Fox were inconsistent with the medical evidence and Plaintiff's activities of daily living. Moreover, Plaintiff has failed to explain or otherwise show that the ALJ committed legal error in her assessment of these opinions, but merely invites this court to re-weigh the evidence in her favor, which this Court is not permitted to do. Therefore, Plaintiff's challenge to the ALJ's residual functional capacity based on the ALJ's assessment of the medical opinion evidence is unavailing.

**B. The ALJ Did Not Commit Reversible Error by Finding Plaintiff's Vaginal Dysplasia Non-Severe.**

Plaintiff next argues that the ALJ erred in finding Plaintiff's vaginal dysplasia to be a non-severe impairment. (Pl.'s Mem. at 2, 13-15.) According to Plaintiff, the medical evidence shows that Plaintiff's vaginal dysplasia is "a chronic and persistent condition" that has required multiple surgical procedures in the past and will likely result in more treatment in the future. (Pl.'s Mem. at 14, citing R. at 10, 789.) Moreover, Plaintiff's symptoms include "burning, pain, and irritation[,]" which result in increased anxiety and depression. (Pl.'s Mem. at 14-15.) In response, Defendant asserts that substantial evidence supports the ALJ's step two findings. (Def.'s Mem. at 29-31.) Defendant adds that, "[d]espite bearing the burden of proof to establish the severity of her impairments . . . Plaintiff has entirely failed to point to *any* evidence that would support [such] a finding . . . nor has she identified any significant work-related functional limitations related thereto." (Def.'s Mem. at 30) (emphasis in original.) According to Defendant, "[a]lthough Plaintiff experienced temporary discomfort associated with these procedures, the record is devoid of any evidence documenting any work-related limitations related to Plaintiff's vaginal dysplasia." (Def.'s Mem. at 31.)

*1. Legal Standard.*

At the second step of the sequential evaluation, the ALJ considers whether the claimant has one or more medically determinable physical or mental impairments and, if so, determines whether they are "severe." 20 C.F.R. § 404.1521. "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic

work activities." 20 C.F.R. § 404.1522(a). Basic work activities are the "abilities and aptitudes

necessary to do most jobs." 20 C.F.R. § 404.1522(b).

Pursuant to Social Security Ruling 85-28:

> An impairment or combination of impairments is found 'not severe'
> and a finding of 'not disabled' is made at this step when medical
> evidence establishes only a slight abnormality or a combination of
> slight abnormalities which would have no more than a minimal
> effect on an individual's ability to work even if the individual's age,
> education, or work experience were specifically considered (i.e., the
> person's impairment(s) has no more than a minimal effect on his or
> her physical or mental ability(ies) to perform basic work activities)
> . . . .

> A determination that an impairment(s) is not severe requires a
> careful evaluation of the medical findings which describe the
> impairment(s) and an informed judgment about its (their) limiting
> effects on the individual's physical and mental ability(ies) to
> perform basic work activities; thus, an assessment of function is
> inherent in the medical evaluation process itself. At the second step
> of sequential evaluation, then, medical evidence alone is evaluated
> in order to assess the effects of the impairment(s) on ability to do
> basic work activities . . . .

*See* SSR 85-28, 1985 SSR LEXIS 19 (Jan. 1, 1985).

Between steps three and four, the ALJ determines the claimant's residual functional

capacity, which is "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R.

§ 404.1545(a). The ALJ first assesses the nature and extent of the claimant's physical and mental

limitations and restrictions and then determines the claimant's residual functional capacity for

work activity on a regular and continuing basis. 20 C.F.R. § 404.1545(b). The residual functional

capacity should be assessed "based on all the relevant evidence in [the claimant's] case record"

and considering all of the claimant's medically determinable impairments, including those that are

not severe. 20 C.F.R. § 404.1545(a). The residual functional capacity must assess the claimant's

work-related abilities on a function-by-function basis, including any relevant functions listed in 20

C.F.R. Sections 404.1545 and 416.945. SSR 96-8p, 1996 SSR LEXIS 5. "The assessment must also include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Britt v. Saul*, 860 Fed. App'x 256, 262 (4th Cir. 2021). In the Fourth Circuit, there is not a per se rule requiring remand for failure to perform an explicit function-by-function analysis; rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015).

Because an ALJ is required to consider all of a claimant's medically determinable impairments when assessing the claimant's residual functional capacity, including those that are not severe, courts have held that errors when determining a medically determinable impairment is not severe is harmless if the ALJ considers the not severe impairments in the ALJ's residual assessment. *See Ferrebee v. Saul*, No. 1:19CV1139, 2021 U.S. Dist. LEXIS 22142, 2021 WL 410886, at *5 (M.D.N.C. Feb. 5, 2021) ("Where an ALJ finds at least one severe impairment, any failure to identify more generally cannot constitute reversible error, because, upon determining that a claimant has one severe impairment, the ALJ must continue with the remaining steps in his disability evaluation."); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (concluding an ALJ's failure to list a medically-determinable impairment as severe was harmless error where the ALJ "extensively discussed" and considered any limitations posed by the impairment in the fourth step of the analysis); *compare Hurtado v. Astrue*, No. 1:09-1073-MBS-SVH, 2010 U.S. Dist. LEXIS 84771, 2010 WL 3258272, at *14 (D.S.C. July 26, 2010) (remanding because second step finding was not supported by substantial evidence when ALJ failed to explain and discuss certain of

claimant's impairments in the decision). Finding an impairment to be severe at the second step, does not require the ALJ to include any limitations arising from such impairment in the claimant's residual functional capacity. *Hughes v. Astrue*, No. 1:09cv459, 2011 U.S. Dist. LEXIS 110254, 2011 WL 4459097, at *10 (W.D.N.C. Sept. 26, 2011).

2. *The ALJ's Findings.*

In regards to Plaintiff's vaginal dysplasia, the ALJ determined that:

> [Plaintiff] also has a history of cervical cancer in 1995 and vulvar cancer in 2004, which her treating gynecologist, Leigh Cantrell, M.D., stated were in remission as of March 2021. Dr. Cantrell also noted that [Plaintiff] has 'chronic and persistent vaginal dysplasia, which has required multiple surgical procedures and will likely require future surgeries and treatment modalities.' Dr. Cantrell reported that [Plaintiff]'s vaginal dysplasia often causes vaginal discomfort and pain. The record shows [Plaintiff] underwent several ablation and laser therapy procedures due to vaginal lesions during the relevant period. However, her cancer remains in remission, and there is no evidence that her vaginal dysplasia has caused more than minimal work-related limitations. Therefore, the undersigned finds [Plaintiff]'s history of cervical cancer, vulvar cancer, and vaginal dysplasia nonsevere.

(R. at 25) (internal citations omitted.)

The ALJ explained how she considered the opinion of state agency medical consultant Jack Hutcheson, M.D. ("Dr. Hutcheson"), when she found Plaintiff's physical impairments, including her vaginal dysplasia, to be non-severe. (R. at 25.) The ALJ noted that Dr. Hutcheson limited Plaintiff to a full range of light work. (R. at 25.) However, she concluded that his opinion was unpersuasive, because it was "unsupported by the evidence cited of normal physical examinations and [Plaintiff]'s capability for walking a mile and performing light housework. It is also inconsistent with [Plaintiff]'s normal gait following her knee reduction, and her frequent travel reported to providers." (R. at 25) (internal citations omitted.)

26

In asserting reversible error, Plaintiff makes a conclusory statement that her vaginal dysplasia had more than a minimal effect on her ability to work without connecting such conclusion to any evidence in the record. A review of the ALJ's decision shows that the ALJ nonetheless accounted for Plaintiff's vaginal dysplasia in her residual functional capacity analysis by accounting for physical impairments that were found to be non-severe. (R. at 27.) For instance, the ALJ assessed Plaintiff with the ability to perform a range of medium work while providing physical restrictions on Plaintiff's abilities to kneel, crouch, and climb ramps and stairs. (R. at 27.) In effect, the ALJ considered all the limiting symptoms connected with Plaintiff's physical health impairments – including vaginal dysplasia – and crafted a residual functional capacity that accounted for Plaintiff's limitations. (R. at 25-27.) Moreover, a review of the record shows little indication of how, and to what extent, Plaintiff's vaginal dysplasia impacts her ability to perform work-related activities. Consequently, the undersigned finds that substantial evidence supports the ALJ's finding at step two.

## VI. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 15) and Motion to Remand (ECF No. 16) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 18) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to United States District Judge David J. Novak and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen**

**(14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____/s/ MRC_____
Mark R. Colombell
United States Magistrate Judge

Richmond, Virginia
Date: December 28, 2022

28